Filed 3/5/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LT NAPA PARTNERS LLC, et al.,<br><br>    Defendants and Appellants. | A139625<br><br>(Napa County Super. Ct.<br>No. 26-61166) |

Plaintiff and respondent Animal Legal Defense Fund (plaintiff) filed an action against defendants and appellants LT Napa Partners LLC and Kenneth Frank (defendants), alleging defendants sold foie gras in their Napa restaurant in violation of section 25982 of the Health and Safety Code (Section 25982). Defendants moved to strike plaintiff's claim pursuant to the anti-SLAPP statute,[1] section 425.16 of the Code of Civil Procedure (Section 425.16). Defendants appeal from the trial court's denial of the motion. We affirm.[2]

BACKGROUND

In 2004, the Legislature enacted Section 25982, banning the sale of foie gras effective July 1, 2012. (See Health & Saf. Code §§ 25980, et seq.) Plaintiff advocated

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] On January 7, 2015, a Federal District Court held that Section 25982 is preempted by federal law and enjoined its enforcement. (*Des Eleveurs de Canards et d'Oies du Quebec v. Harris* (C.D.Cal., Jan. 7, 2015, No. 2:12-cv-5735-SVW-RZ) ___ F.Supp.3d. ___ [2015 U.S. Dist. LEXIS 5806].) Two days before oral argument, defendants requested dismissal of the present appeal, apparently on the basis that the present lawsuit was mooted by the federal ruling. We denied that request. Nothing in that denial or in this decision precludes defendant from presenting arguments after remand regarding the effect of the federal decision on the present lawsuit.

1

for passage of the ban and has been active in informing the public about the law and its view that production of foie gras involves cruelty to animals.[3] Defendant Frank, who is the head chef at Napa restaurant La Toque, has been a vocal opponent of Section 25982. For example, he testified at state senate hearings preceding passage of the law, publicly debated the merits of the ban, and authored a newspaper opinion article against the ban. La Toque is owned by defendant LT Napa Partners, LLC ("LT Napa"); Frank is the managing member of LT Napa.

After the ban went into effect, plaintiff paid an investigator to dine at La Toque on three occasions in September 2012, October 2012, and March 2013. On each occasion he requested foie gras and was told that if he ordered an expensive tasting menu he would receive foie gras. On two of the occasions it was described as a "gift" from the chef. He ordered the tasting menus and was served foie gras. He was not told he was served foie gras in protest against the foie gras ban and was not provided information about defendant Frank's opposition to the foie gras ban.[4]

Plaintiff brought the results of its investigation to Napa law enforcement authorities. Over the course of three months, plaintiff attempted to persuade the Napa authorities to take action based on the alleged violation of Section 25982 at La Toque, but the city attorney declined. Subsequently, plaintiff initiated the present suit, alleging a cause of action under the Unfair Competition Law ("UCL") (Bus. & Prof. Code §§ 17200, et seq.) based on defendants' alleged violation of Section 25982. Plaintiff does not request damages but seeks an injunction prohibiting defendants from "furnishing, preparing, or serving foie gras in any form or manner whatsoever."

Defendants brought a special motion to strike plaintiff's action as a SLAPP under Section 425.16. The trial court denied the motion, concluding defendants had failed to

---

[3] Section 25982 bans the sale of products that are "the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."

[4] In a declaration, Frank averred that, "[s]hortly after" the investigator's March 2013 visit, La Toque started "presenting a 'protest card' " when serving foie gras. He averred the cards explained his "criticism of and opposition to" Section 25982.

show plaintiff's cause of action arose from protected activity and concluding plaintiff had shown a probability of prevailing on the merits. This appeal followed.[5]

DISCUSSION

I.   *The Anti-SLAPP Law*

"In 1992, the Legislature enacted [S]ection 425.16 in an effort to curtail lawsuits brought primarily 'to chill the valid exercise of . . . freedom of speech and petition for redress of grievances' and 'to encourage continued participation in matters of public significance.' (§ 425.16, subd. (a).)  The section authorizes a special motion to strike '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States [Constitution] or [the] California Constitution in connection with a public issue . . . .' (§ 425.16, subd. (b)(1).) The goal is to eliminate meritless or retaliatory litigation at an early stage of the proceedings. [Citations.]  The statute directs the trial court to grant the special motion to strike 'unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' (§ 425.16, subd. (b)(1).)" (*Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1395–1396, fn. omitted (*Gallimore*).)

"The statutory language establishes a two-part test.  First, it must be determined whether the plaintiff's cause of action arose from acts by the defendant in furtherance of the defendant's right of petition or free speech in connection with a public issue. [Citation.]  'A defendant meets this burden by demonstrating that the *act underlying* the plaintiff's cause fits one of the categories spelled out in [S]ection 425.16, subdivision

---

[5] We have considered an amicus curiae brief filed in favor of plaintiff by John L. Burton, the author of the senate bill that resulted in enactment of the ban on foie gras.  Amicus requested that this court take judicial notice of various legislative history materials regarding the enactment of Section 25982.  We deny the request because most of the materials are unnecessary to resolution of the issues on appeal and those materials that we rely upon are published materials regarding which a motion for judicial notice is unnecessary.  (*Wittenberg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4 ["A motion for judicial notice of published legislative history, such as the Senate Analysis here, is unnecessary."].)

3

(e).' [Citation.] Assuming this threshold condition is satisfied, it must then be determined that the plaintiff has established a reasonable probability of success on his or her claims at trial." (*Gallimore*, *supra*, 102 Cal.App.4th at p. 1396.) "Whether [S]ection 425.16 applies and whether the plaintiff has shown a probability of prevailing are both legal questions which we review independently on appeal." (*Ibid.*) The statute provides that Section 425.16 "shall be construed broadly." (§ 425.16, subd. (a).)

II.      *We Assume For Purposes of Appeal That Plaintiff's Lawsuit Arises Out of Defendants' Conduct In Furtherance of Speech*

A defendant can meet its burden of making a threshold showing that a cause of action is one arising from protected activity by demonstrating the act underlying the plaintiff's cause of action falls within one of the four categories identified in Section 425.16, subdivision (e). (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) Among other things, defendants contend plaintiff's UCL claim arises out of "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) In particular, they contend the serving of foie gras at La Toque was in furtherance of defendant Frank's public opposition to the foie gras ban. For purposes of the present appeal we will assume that conduct is protected activity within the meaning of Section 425.16, subdivision (e). (See *Smith v. Adventist Health Systems/West* (2010) 190 Cal.App.4th 40, 56 [assuming satisfaction of first step and proceeding to consideration of second step of Section 425.16 analysis].)

III.      *Plaintiff Has Demonstrated a Probability of Prevailing*

In order to establish a probability of prevailing for purposes of Section 425.16, subdivision (b)(1), " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.) However, a defendant that advances an affirmative defense to the plaintiff's claims bears the burden of proof on the defense.

(*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676.)

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' ([Bus. & Prof. Code] § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citations.] In service of that purpose, the Legislature framed the UCL's substantive provisions in ' "broad, sweeping language" ' [citations] and provided 'courts with broad equitable powers to remedy violations.' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset*).)

On appeal, defendants contend plaintiff failed to demonstrate a probability of prevailing because plaintiff lacks standing, there is no basis for liability against defendant Frank, and plaintiff's evidence fails to show defendants sold foie gras within the meaning of Section 25982. We disagree.

A.    *Plaintiff Has Shown a Probability of Prevailing on The Standing Issue*

1.    *Legal Background*

In *Kwikset*, *supra*, 51 Cal.4th 310, the California Supreme Court examined the standing requirements of the UCL in light of the 2004 approval of Proposition 64. The court explained that, "While the substantive reach of [the UCL] remains expansive, the electorate has materially curtailed the universe of those who may enforce [its] provisions. . . . 'In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by "any person acting for the interests of itself, its members or the general public" [citation], now private standing is limited to any "person who has suffered injury in fact and has lost money or property" as a result of unfair competition. [Citations]. The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of " 'clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant. . . .' " [Citation.] While the voters clearly intended to restrict UCL

5

standing, they just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices.' " (*Kwikset*, *supra*, 51 Cal.4th at pp. 320–321.)[6]

*Kwikset* interpreted the Proposition 64 requirement that a party has "lost money or property" to mean that a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset*, *supra*, 51 Cal.4th at p. 322.) *Kwikset* pointed out that " '[i]njury in fact' is a legal term of art" that makes reference to one of the requirements for federal standing under article III, section 2 of the United States Constitution. (*Kwikset*, at p. 322.) Indeed, "[t]he text of Proposition 64 establishes expressly that in selecting this phrase the drafters and voters intended to incorporate the established federal meaning. The initiative declares: 'It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been *injured in fact under the standing requirements of the United States Constitution*.' " (*Kwikset*, at p. 322.)

"[P]roof of injury in fact will in many instances overlap with proof of" loss of "money or property," as also required by Proposition 64. (*Kwikset*, *supra*, 51 Cal.4th at p. 323.) *Kwikset* noted that such "economic injury . . . is itself a classic form of injury in fact," and "the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact." (*Kwikset*, at pp. 323–324.) "However, because economic injury is but one among many types of injury in fact, the Proposition 64 requirement that injury be economic renders standing under [Business and Professions Code,] section 17204 substantially narrower than federal standing under article III, section 2 of the United States Constitution, which may be predicated on a broader range

---

[6] The UCL's standing provision provides, "[a]ctions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by [various law enforcement officials] . . . or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code § 17204.)

6

of injuries." (*Kwikset*, at p. 324.)  Nevertheless, injury in fact is "not a substantial or insurmountable hurdle;" it suffices "to ' "allege[ ] some specific, 'identifiable trifle' of injury." ' " (*Ibid*.)  "If a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact." (*Id.* at p. 325.)

Finally, "Proposition 64 requires that a plaintiff's economic injury come 'as a result of' the unfair competition . . . . [Citations.]  'The phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of a causal connection or reliance . . . .' " (*Kwikset*, *supra*, 51 Cal.4th at p. 326.)

### 2.  *Analysis*

In the present case, plaintiff contends it suffered injury in fact and lost money as a result of defendants' conduct in serving foie gras because it "has diverted significant organizational resources to combat [defendants'] continuing illegal sales of foie gras." Plaintiff submitted a detailed declaration from its executive director, Stephen Wells, outlining plaintiff's advocacy against foie gras in general and in favor of California's ban on the sale of foie gras in particular.  Plaintiff wrote letters of support for the bill that enacted Section 25982, and "[d]uring the months before the law became effective, [plaintiff] performed public outreach to remind the public of the July 1, 2012 effective date and reinforce the law's importance."  Following the effective date of the ban, plaintiff paid a private investigator to visit La Toque, and "[u]pon learning the results of the investigations . . . , paid staff at ALDF diverted their attention from other ALDF projects to analyze the facts obtained during the investigation."  Subsequently, plaintiff "expended significant staff time and resources to share its investigation findings with Napa law enforcement authorities."  Plaintiff's staff attorneys "diverted time and attention from other projects and attempted to persuade the Napa authorities to enforce" the ban on sale of foie gras "over the course of at least three months."  Mr. Wells' declaration also averred that defendants' alleged violations of Section 25982 "harm [plaintiff's] organizational mission," and "[t]he diversion of limited resources has caused [plaintiff] to postpone projects that would reach new media markets, reach new people,

better develop [plaintiff's] organization, and advance its mission." Alternatives to spending on the California foie gras ban include, for example, "advocating an end to cruel production methods in other states and at the federal level."

Plaintiff points out that, although *Kwikset* declined to "supply an exhaustive list of the ways in which unfair competition may cause economic harm," the court did note that a plaintiff "required to enter into a transaction, costing money or property, that would otherwise have been unnecessary" would have standing under the UCL. (*Kwikset*, *supra*, 51 Cal.4th at pp. 323–324.) Plaintiff contends its expenditure of resources in investigating defendants' alleged sales of foie gras and attempting to persuade the Napa authorities to prosecute were such transactions. *Kwikset* cited *Hall v. Time Inc*. (2008) 158 Cal.App.4th 847, 854–855 (*Hall*), as a case "cataloguing some of the various forms of economic injury." (*Kwikset*, at p. 323.) *Hall* had cited *Southern Cal. Housing v. Los Feliz Towers Homeow*. (C.D.Cal. 2005) 426 F.Supp.2d 1061, 1069 (*Southern Cal. Housing*), as an example of a case where a plaintiff "expended money due to the defendant's acts of unfair competition," with the parenthetical "housing rights center lost financial resources and diverted staff time investigating case against defendants." (*Hall*, at p. 854.) In *Southern Cal. Housing*, the federal district court held that a housing advocacy organization met the Proposition 64 standing requirement by "present[ing] evidence of actual injury based on the loss of financial resources in investigating [a] claim and diversion of staff time from other cases to investigate the allegations here." (*Southern Cal. Housing*, at p. 1069.) Accordingly, although *Kwikset* did not *hold* that the precise expenditures made by plaintiff constitute injury in fact under the UCL, the court did express some approval for that proposition through its approving citation to *Hall*.

Cases addressing the federal standing requirement—which are relevant as explained in *Kwikset*, *supra*, 51 Cal.4th at page 322—also support the proposition that the plaintiff's claimed diversion of resources can constitute injury in fact. For example, in *Havens Realty Corp. v. Coleman* (1982) 455 U.S. 363 (*Havens*), a Fair Housing Act action, the plaintiff alleged it "had to devote significant resources to identify and counteract the defendant's . . . racially discriminatory steering practices." (*Havens*, at p.

8

379.) *Havens* held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" was sufficient to demonstrate injury in fact. (*Ibid.*; see *Fair Hous. of Marin v. Combs* (9th Cir. 2002) 285 F.3d 899, 903–905 [listing cases and finding standing where organization's "resources were diverted to investigating and other efforts to counteract [the defendant's] discrimination above and beyond litigation"].)

Defendants rely on *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798 (*Buckland*), disapproved on other grounds in *Kwikset*, *supra*, 51 Cal.4th 310, in arguing that plaintiff does not have standing. But the reasoning of that case supports plaintiff's position that it has established a prima facie case. In *Buckland*, a women's rights advocate bought skin creams that were allegedly sold by the defendants in violation of federal marketing laws. (*Id.* at 804–805.) The plaintiff in *Buckland* acknowledged she had incurred "the cost of purchasing each of these products in order to meet the letter of the law to have . . . economic damages that provide standing under the statutes by which I am proceeding in the case." (*Id.* at p. 805.) In considering whether the plaintiff had standing under the UCL, *Buckland* surveyed the post-*Havens* federal case law and concluded the federal circuits were divided on "whether the costs an organization incurs to pursue litigation are sufficient, in themselves, to establish an injury in fact." (*Id.* at p. 815.) *Buckland* adopted the rule of the majority of the circuits that, " '[a]n organization cannot . . . manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.' " (*Ibid.*, quoting *Spann v. Colonial Village, Inc.* (D.C. Cir. 1990) 899 F.2d 24, 27 (*Spann*).) *Buckland* concluded its plaintiff did not have standing under that rule "[b]ecause the costs were incurred solely to facilitate her litigation . . . [and] to hold otherwise would gut the injury in fact requirement." (*Buckland*, at p. 816.)

Nevertheless, *Buckland* recognized that, under the federal cases it followed, "funds expended independently of the litigation to investigate or combat the defendant's misconduct may establish an injury in fact." (*Buckland*, *supra*, 155 Cal.App.4th at p. 815, citing *Spann, supra,* 899 F.2d at p. 27; see also *Fair Housing Council v.*

9

*Roommate.com, LLC* (9th Cir. 2012) 666 F.3d 1216, 1219 ["[A]n organization has 'direct standing to sue [when] it showed a drain on its resources from both a diversion of its resources and frustration of its mission.' [Citation.] However, ' "standing must be established independent of the lawsuit filed by the plaintiff." ' "].) *Buckland* distinguished *Havens* and *Southern Cal. Housing* on the basis that Buckland could not allege a "diversion of resources" comparable to the allegations of the organizations in those other two cases, "and her investigation costs, if any, are inextricably tied to her litigation expenses." (*Buckland*, at p. 816; see *Havens*, *supra*, 455 U.S. at p. 379; *Southern Cal. Housing*, *supra*, 426 F.Supp.2d at p. 1069.)

Accepting, as we must, the truth of the averments in Mr. Wells' declaration (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 444), we conclude the present case is like *Havens* and *Southern Cal. Housing* and unlike *Buckland*. The declaration indicates plaintiff spent months on the effort to persuade Napa authorities to take action based on the alleged violations of Section 25982. Thus, plaintiff has presented evidence its investigatory expenditures, as well as the resources spent in attempting to persuade the authorities, had a purpose independent of the current litigation and might have rendered such litigation unnecessary.[7] Moreover, Mr. Wells' declaration indicates that, in addition to general advocacy against foie gras, plaintiff specifically advocated for passage of the California ban on sale of foie gras and has expended resources on educating the public about the ban, including immediately before the statute's July 2012 effective date. Plaintiff, thus, has presented evidence of a genuine and longstanding interest in the effective enforcement of the statute and in exposing those who violate it. Plaintiff's evidence provides a basis to conclude that defendants' alleged violations of the statute tended to frustrate plaintiff's advocacy for an *effective* ban on the sale of foie gras in California, and tended to impede plaintiff's ability to shift its focus on

---

[7] We need not and do not conclude that plaintiff will ultimately persuade the court that the expenditure of resources had a purpose independent of the current litigation and were not expenditures made to "manufacture the injury." (*Buckland, supra*, 155 Cal.App.4th at p. 815.) We hold only that plaintiff's showing regarding standing is sufficient to defeat the defendants' special motion to strike.

10

advocacy efforts in, for example, other states and at the federal level. (See *Havens*, *supra*, 455 U.S. at p. 379 [the plaintiff alleged the defendants' racial steering practices " 'frustrated' " the plaintiff's " 'efforts to assist equal access to housing through counseling and other referral services' "].) In sum, Mr. Wells' declaration is sufficient to make a prima facie showing of standing to sue.

Defendants argue that a recent decision from this District's Division 4, *Two Jinn, Inc. v. Government Payment Service, Inc.* (Feb. 3, 2015, A136984) ___ Cal.App.4th ___ [2015 Cal.App. Lexis 102] (*Two Jinn*), demonstrates plaintiff's lack of standing. There, a licensed bail agent brought a UCL action to enjoin the defendant from engaging in bail agent activities in violation of legal requirements. (*Two Jinn*, at *2.) The plaintiff, like plaintiff in this case, argued it had standing because " '[w]ell before any litigation was considered,' it expended significant time and resources investigating and documenting [the defendant's] activities in order to assist government regulators and convince them to uniformly enforce the law." (*Id.* at *24.) The *Two Jinn* court assumed that under *Buckland* such a showing would demonstrate that plaintiff's investigation "was conducted independently of [the] lawsuit," but the court held that the plaintiff had failed to present any evidence in support of its argument. (*Two Jinn*, at *24.) "Indeed, [plaintiff's general counsel] expressly conceded that [its] investigation constituted 'pre[-]litigation activities.' " (*Ibid.*) The court noted that the plaintiff had shared its evidence with the California Department of Insurance, but "it did so as part of this litigation in order to support its petition for a writ of mandate." (*Ibid.*) Here, Mr. Wells' declaration, which avers the investigation and enforcement efforts with Napa authorities had a purpose independent of the lawsuit, as well as harm from the diversion of resources and the frustration of plaintiff's advocacy efforts, provides the evidence absent in *Two Jinn* and establishes a prima facie case of standing.

We also reject defendants' contention that plaintiff failed to make a prima facie showing that its economic injury was "caused by" defendants' conduct (*Kwikset*, *supra*, 51 Cal.4th at p. 326), because the "purpose of [plaintiff's] existence is to invest [its] resources in litigation activities." That the expenditure of resources in investigating

11

defendants' alleged lawbreaking was wholly consistent with plaintiff's mission does not mean the resources were not in fact diverted from other activities as a result of defendants' conduct. Where the economic injury is diversion of resources, the proper focus of the inquiry is not the "voluntariness or involuntariness" of the expenditures. (*Equal Rights Center. v. Post Properties, Inc.* (D.C.Cir. 2011) 633 F.3d 1136, 1140 (*Equal Rights Center*).) Instead, the proper focus is on whether the plaintiff "undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [misconduct] rather than in anticipation of litigation." (*Ibid.*)[8] Plaintiff has made a prima facie showing it can satisfy the UCL's causation requirement for standing.

B.      *Plaintiff Has Shown a Probability of Prevailing on Its Claim That Defendants Unlawfully Sold Foie Gras*

1.      *Plaintiff Has Shown a Basis for Liability Against Defendant Frank*

Defendants contend plaintiff has not shown a basis for liability against defendant Frank because there is no evidence that Frank himself directly served foie gras to any patron of La Toque. However, the complaint alleges, "[d]efendants, by themselves *and through agents*, routinely sell foie gras in violation of" Section 25982. (Emphasis added.) The evidence in the record shows Frank is the "managing member" of LT Napa (the owner of La Toque) and has worked as the restaurant's "head chef" since 1976. Moreover, there is evidence Frank is personally responsible for the restaurant's policy regarding serving foie gras. His own declaration states, "In the exercise of my constitutionally protected right of petition and free speech, my restaurant, La Toque, is protesting the law, not breaking it, by giving away foie gras to customers I choose to give it to. I give away a much smaller amount of foie gras than I did before July 1, 2012, when Section 25982 went into effect. However, what I do give away to customers is my way of dumping tea in the harbor, so to speak." If the serving of foie gras at La Toque

---

[8] Although the *Equal Rights Center* case did not frame this aspect of the standing issue as a causation analysis, the reasoning of the case is applicable to show satisfaction of the UCL's causation requirement.

12

violates Section 25982, plaintiff has shown a basis for its claim that Frank is personally liable for the violation.[9]

2.    *Plaintiff Has Shown A Probability of Prevailing on Its Claim Defendants Unlawfully "Sold" Foie Gras*

"Business and Professions Code section 17200 et seq. prohibits unfair competition, including unlawful, unfair, and fraudulent business acts.  The UCL covers a wide range of conduct.  It embraces ' " ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " ' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143, fn omitted.)  "[Business and Professions Code] Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.  [Citation.]" (*Korea Supply*, at p. 1143.)  At issue in the present case are Health and Safety Code section 25981 and Section 25982.  Under Health and Safety Code section 25981, it is unlawful to "force feed a bird for the purpose of enlarging the bird's liver beyond normal size."  Section 25982, in turn, prohibits the sale of foie gras produced through force-feeding, stating "[a] product may not be sold in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."  Plaintiff's UCL action claims defendants violated Section 25982 by selling foie gras at La Toque.

"As with all questions of statutory interpretation, we attempt to discern the Legislature's intent, 'being careful to give the statute's words their plain, commonsense meaning.  [Citation.]  If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' " (*Ste. Marie v. Riverside County Regional Park & Open–Space Dist.* (2009) 46 Cal.4th 282, 288.)  If terms used in a statute "are not specifically defined, a court may also consider evidence of legislative history in ascertaining the statute's

---

[9] Because plaintiff has shown a probability of prevailing on this issue, we need not address its contention that defendants forfeited the issue by failing to properly raise it below.

13

meaning." (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425.)

At the outset, we reject defendants' contention that Section 25982 is a statute "imposing criminal penalties" that must be construed narrowly. In *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294 (*Lungren*), the California Supreme Court rejected the proposition that "all statutes with *civil monetary* penalties should . . . be strictly construed." (*Id.* at p. 313.) The court interpreted "dictum" in *Hale v. Morgan* (1978) 22 Cal.3d 388—upon which defendants here rely—as possibly supporting narrow construction of a statute's " 'penalty clause.' " (*Lungren*, at p. 314.) But *Hale* "did not purport to alter the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose." (*Lungren*, at p. 313; accord *Smith v. Superior Court* (2006) 39 Cal.4th 77, 92.) In particular, that rule of broad construction applies to the interpretation of statutes "that define[] the conduct proscribed by the Act, and the scope of the government's authority to enjoin and prohibit that conduct, rather than the method of assessing the amount of penalty for transgressing the proscription." (*Id.* at p. 314.) That is what is at issue in the present case: we construe the language of Section 25982 defining what conduct is prohibited, rather than a penalty clause related to the prohibition. Because defendants do not deny that Section 25982 is intended for the protection of the public within the meaning of *Lungren*,[10] we broadly construe Section 25982 in favor of its public purposes.[11]

---

[10] The legislative history indicates proponents of the foie gras ban argued the force feeding involved in its production "is a cruel and inhumane process." (See, e.g., Sen. Com. on Bus. & Prof., Analyses of Sen. 1540 (2003–2004 Reg. Sess.) as amended Apr. 26, 2004; Assem. Com. On Bus. & Prof., Analysis of Sen. 1520 (2003–2004 Reg. Sess.) as amended May 6, 2004.) " 'It has long been the public policy of this country to avoid unnecessary cruelty to animals.' [Citation.] '[T]here is a social norm that strongly proscribes the infliction of any "unnecessary" pain on animals, and imposes an obligation on all humans to treat nonhumans "humanely." ' " (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 504; see also *Church of the Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 538 [referring to "legitimate governmental interests in . . . preventing cruelty to animals"].) Defendants do not dispute

14

On the merits, defendants do not dispute that the foie gras served at La Toque was produced through force-feeding. The sole issue regarding the applicability of Section 25982 is whether defendants' conduct in serving foie gras at La Toque constituted "sales" prohibited under the statute. In opposing defendants' anti-SLAPP motion, plaintiff presented a declaration from its investigator, who averred that on three occasions he was told he would obtain foie gras if he purchased a tasting menu at La Toque. On two of the occasions the foie gras was characterized as a "gift," apparently foie gras was not listed in the description of the tasting menu, and apparently a separate amount was not charged for the item. Defendants quote section 2106, subdivision (1) of the Commercial Code for the proposition that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Although that definition expressly applies only to the Commercial Code, both parties agree it is a reasonable general definition. (See also Merriam-Webster's Collegiate Dictionary, 10th ed., 2001, at p. 1028 [defining a "sale" as "the transfer of ownership of and title to property from one person to another for a price"].) Employing that definition, defendants assert that plaintiff's evidence does not show that foie gras was provided for a price.

We find guidance in the California Supreme Court's recent decision in *Ennabe v. Manosa* (2014) 58 Cal.4th 697. There, the court applied section 25602.1 of the Business and Professions Code, which states that a person "who sells, or causes to be sold, any alcoholic beverage, to any obviously intoxicated minor" can be liable for resulting injuries or death. (See *Ennabe*, at pp. 702, 709–710.) The court considered whether the defendant could be held liable under the provision where she supplied alcohol to a minor at a party, and the minor was charged a fee to enter the party. (*Ibid.*) The statute considered in *Ennabe* is part of the Alcoholic Beverage Control Act, which defines a sale

_____

that the public interest in preventing cruelty to animals is equivalent to the interest in the "protection of the public" referenced in *Lungren*, *supra*, 14 Cal.4th at page 313.

[11] The additional cases cited by defendants supporting their argument for narrow construction of Section 25982 precede *Lungren* and do not provide a basis to distinguish the present case from *Lungren*. (See, e.g., *People v. Mobile Oil Corp.* (1983) 143 Cal.App.3d 261.)

15

to include "any transaction whereby, for any consideration, title to alcoholic beverages is transferred from one person to another." (Bus. & Prof. Code, § 23025; see also *Ennabe*, at p. 714.)

In interpreting the statute, *Ennabe* noted it was unclear whether a rule of liberal or strict construction was applicable, because both rules applied under different principles of statutory interpretation. (*Ennabe*, *supra*, 58 Cal.4th at pp. 713–714.) Turning to the statutory language, *Ennabe* stated, the "broad definition of a sale shows the Legislature intended the law to cover a wide range of transactions involving alcoholic beverages: a qualifying sale includes '*any* transaction' in which title to an alcoholic beverage is passed for '*any* consideration.' (Italics added.) Use of the term 'any' to modify the words 'transaction' and 'consideration' demonstrates the Legislature intended the law to have a broad sweep and thus include both indirect as well as direct transactions." (*Ennabe*, at p. 714.) The court concluded "the plain meaning of a 'sale,' as defined in [Business and Professions Code] section 23025 and used in [Business and Professions Code] section 25602.1, includes [the minor's] payment of the entrance fee for [the defendant's] party, irrespective of the fact possession of a particular drink did not occur immediately upon payment." (*Ennabe*, at p. 715.)

*Ennabe* cited with approval a 1985 Attorney General Opinion that is more analogous to the present case. (*Ennabe*, *supra*, 58 Cal.4th at pp. 716–717.) In that opinion, the California Attorney General interpreted liquor licensing laws with respect to commercial enterprises that offer "complimentary" alcoholic beverages to paying customers who purchase another good or service. (*Offer of "Complimentary" Alcoholic Beverage is "Sale"*, 68 Ops.Cal.Atty.Gen. 263 (1985) ("Opinion No. 85-701").) The Attorney General was asked, "May the operator of a commercial enterprise who does not have an alcoholic beverage license legally offer and provide 'complimentary' alcoholic beverages to any interested adult guest, customer or passenger of the business or service, without specific charge while at the same time charging for the product provided or the services rendered?" (*Id.* at 263.) Considering analogous out-of-state authority, the Attorney General concluded that "complimentary" alcohol is in fact "sold," even though

16

the operators do not charge additional amounts to customers who elect to consume alcohol. (*Id.* at pp. 265–267.) As the opinion explained, " 'It is wholly immaterial that no specific price is attached to those articles separately.' . . . [T]he furnishing of the beverages, although denominated 'complimentary', are for a consideration and constitute a sale within the meaning of California's Alcoholic Beverage Control Act." (*Id.* at p. 267; accord *Ennabe*, at p. 717.) To hold otherwise would undermine the Legislature's intent to regulate the provision of alcoholic beverages. (Opinion No. 85-701, at p. 267.)

Under *Ennabe* and Opinion No. 85-701, La Toque's serving of foie gras as part of a tasting menu constituted a sale of foie gras. Plaintiff's investigator's decision to order and agreement to pay the specified price for the tasting menu was the consideration offered for the entirety of the food served, including the foie gras. (*H. S. Crocker Co., Inc. v. McFaddin* (1957) 148 Cal.App.2d 639, 644 (*H. S. Crocker Co.*) ["The 'price' is the consideration passing from the buyer to the seller for the latter's interest in the thing sold."].) Under the investigator's averments, the foie gras served as part of the menu was "sold" to him as much as any other part of the tasting menu. Defendants present no reason in logic or the law why we should conclude otherwise. Defendants assert that "giving free foie gras to customers who purchased specific meals at the normal price was not a 'sale.' " It appears they contend not all of the patrons who ordered the tasting menu received foie gras, despite paying the same amount as the investigator. However, regardless of whether other patrons paid the same amount without receiving foie gras, the investigator's averments show the receipt of foie gras was part of the tasting menu offered to *him prior to his decision to order it*. Thus, the foie gras was part of the property he was offered for the price he agreed to pay. Regardless of whether other patrons received foie gras on a random basis without a prior agreement, the investigator's averments show he was "sold" foie gras as part of the tasting menu. Neither does the server's characterization of the foie gras as a "gift" on two of the occasions change the analysis, when the investigator was led to understand that he could only obtain the "gift" by purchasing the tasting menu. As in *Ennabe* and Opinion No. 85-701, it is " ' "immaterial that no specific" ' " and separate price was attached to the foie gras; the

furnishing of the foie gras, even if characterized as a gift, was " '*for a consideration and constitute[d] a sale* within the meaning of' " Section 25982. (*Ennabe*, *supra*, 58 Cal.4th at p. 717.)[12]

Defendants also argue the concept of sale in Section 25982 should be construed more narrowly than it was in *Ennabe* and Opinion No. 85-701 because the Legislature did not broadly define "sold" for purposes of Section 25982. Defendants assert, "It is instructive that the Legislature chose to adopt the substantially broader definition of 'any consideration' for the 'sale' of alcohol . . . , but chose not to do so for its ban of the 'sale' of foie gras produced by force feeding." We disagree. The standard definition of a sale in the Commercial Code, discussed previously, contemplates that any form of consideration—even non-monetary consideration—may constitute the "price" of the item sold. (*H. S. Crocker Co.*, *supra*, 148 Cal.App.2d at pp. 644–645; accord *Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal. App. 4th 604, 615.) The absence of an express broad definition for "sold" applicable to Section 25982 does not mean that the consideration for foie gras must take any particular form. In light of the broad construction we apply to Section 25982, it is appropriate that the outcome in the present case be the same as that under the Alcoholic Beverage Control Act. Notably, allowing restaurants to avoid the foie gras ban by the expedient of "gifting," while informing patrons they will receive foie gras if they purchase other goods, would substantially

---

[12] Defendants assert La Toque's policy for serving foie gras was other than as described by the investigator. For example, they assert, "There is no evidence in this case that foie gras was offered on a consistent basis to customers that ordered certain meals but only on a random basis to customers chosen by the duty chef. The evidence only showed that a gift of foie gras was offered on some occasions to patrons who ordered certain menu items. . . . La Toque patrons are occasionally served free foie gras on an arbitrary basis, as chosen by the duty chef, and often when the patrons order certain menu items (i.e., those that would complement, or be complemented by, a serving of foie gras)." Regardless of whether defendants ultimately prove the truth of their assertions, the evidence in plaintiff's investigator's declaration is prima facie evidence of a violation of Section 25982 and sufficient to satisfy the second prong of the anti-SLAPP analysis. We need not and do not decide whether serving foie gras for no extra charge on a truly random basis, not tied to particular menu items or in response to a request by a patron, would constitute a sale prohibited under Section 25982.

18

undermine the ban itself.  (See Opinion No. 85-701, *supra*, 68 Ops. Cal Atty. Gen. at p. 267.)

By analogy to *Ennabe*, *supra*, 58 Cal. 4th 697, and Opinion No. 85-701,[13] we construe the term "sold" in Section 25982 to encompass serving foie gras as part of a tasting menu, regardless of whether there is a separate charge for the foie gras, whether it is listed on the menu, and whether it is characterized as a "gift" by the restaurant. Plaintiff has shown a probability of prevailing on its UCL claim based on violation of Section 25982.

## DISPOSITION

The trial court's order is affirmed. Costs on appeal are awarded to respondents.

_____

SIMONS, J.

We concur.


_____

JONES, P.J.


_____

BRUINIERS, J.

_____

[13] In light of the authoritativeness of *Ennabe*, *supra*, 58 Cal. 4th 697, we need not discuss the various other authorities cited by the parties to support their respective positions, none of which is directly on point.

19

Superior Court of Napa County, No. 26-61166, Hon. Diane M. Price, Judge.

Greenwald & Hoffman, Paul A. Hoffman and Paul Evan Greenwald; Law Offices of Manuel S. Klausner and Manuel S. Klausner; and The Michael Tenenbaum Law Firm and Michael Tenenbaum for Defendants and Appellants.

Animal Legal Defense Fund, Matthew Liebman and Christopher A. Berry; Fenwick & West, William R. Skinner for Plaintiffs and Respondents.

Drinker Biddle & Reath, Sheldon Eisenberg and Erin E. McCracken for John L. Burton as Amicus Curiae on behalf of Plaintiffs and Respondents.